THE STATE, THE BOARD OF CHOSEN FREEHOLDERS OF HUDSON COUNTY, PROSECUTORS, v. THE MAYOR AND COUNCIL OF BAYONNE AND WILLIAM C. HAMILTON, CITY CLERK, AND THE LEHIGH VALLEY TERMINAL RAILWAY COMPANY.

1. In the city of Bayonne, before a street has been actually worked to grade, the grade may be altered by the common council upon the application, in writing, of the owners of a majority of the property per lineal foot along the line of said proposed change of grade.

2. A petition for a change of grade had been used for an ordinance which had been set aside. A leaf from the same petition, taken from the files, was attached to a new petition upon which another ordinance for the same improvement was passed. *Held,* on *certiorari,* that it should appear that the persons whose names were upon the leaf taken from the old petition had reacknowledged or assented to the use of their names upon the new petition.

3. One of these names was signed " per Heck, attorney." It appeared that the attorney had not seen his principal, but presumed to act under a written power of attorney, which was not proved and which he received from a third person. *Held,* that this name could not be counted as an applicant.

4. The power to alter the grade of a street implies the power to make only such incidental changes in the grade of intersecting streets as are necessary to adjust the grade of such streets to the changed grade of the principal street.

5. An ordinance changing the grade of a street which protracts the change of grade of the intersecting streets far beyond the limits required for the necessary adjustment of their grade to the altered grade of the principal street is invalid.

6. The act of 1874 (*Rev.,* p. 944), conferring upon cities the power to change grades, whereby railroads entering said cities may relocate, change or elevate its railroad, is not limited to railroads in existence at the time of the passage of the act.

7. A change of grade made under the provisions of the above statute must be confined to such limits as are necessary for the accomplishment of its purpose. An ordinance which extends the lines of such change clearly beyond what is required by the alteration of grade at the point of railroad crossing is illegal.

8. The board of chosen freeholders has an interest in the grade of any street lying within a survey of a county road, which survey has been finally adopted under the act of 1888 (*Pamph. L.,* p. 397), and as prosecutor can try the legality of any ordinance changing the grade of such street.

On *certiorari.*

This writ of *certiorari* brings up for review "An ordinance to change the grade of Avenue A and certain intersecting streets in the Third ward of the city of Bayonne," passed December 16th, A. D. 1890, and passed over the veto of the mayor January 13th, A. D. 1891, and "An ordinance authorizing the grading, paving and flagging of a portion of Avenue A and the construction of a main sewer in West Fifty-ninth street, from Avenue A to Newark bay, in the Third ward of the city of Bayonne," passed January 13th, A. D. 1891, and a certain contract alleged to have been made between the mayor and council of the city of Bayonne and the Jersey City, Newark and Western Railway Company, dated February 2d, 1891, together with all things touching and concerning the same.

Argued at November Term, 1891, before Justices DIXON, REED and GARRISON.

For the prosecutors, *John A. McGrath, Abel I. Smith* and *Warren Dixon.*

For the city of Bayonne, *James P. Northrop.*

For the Lehigh Valley Terminal Railway Company, *Collins & Corbin.*

The opinion of the court was delivered by

REED, J.    The main attack in this case is upon the ordinance to grade Avenue A, a street in the city of Bayonne.

Two questions have been elaborately presented—

*First.* Was the passage of the ordinance to change the grade of Avenue A a legal act of the common council of Bayonne ?

*Second.* If it was not, has the board of chosen freeholders of Hudson county such an interest in the matter as will give:

it a footing, as prosecutor, to test the legality of the ordinance?

We will first consider the question whether the ordinance is the subject of a successful attack by any person.

The provision respecting the change of grade in Bayonne, which controls this proceeding, seems to be found in an act passed in 1870. *Pamph. L., p.* 704. It provides that before a street has been actually worked to grade, the grade may be altered upon the application, in writing, of the owners of a majority of the property per lineal foot along the line of said proposed change of grade; but after said original grades are actually worked, changes shall only be made on the application of three-fourths of said property per lineal foot.

A grade had been established previously to the passage of the ordinance in question, but the street had never been worked to the grade line.

There has been some question as to whether this portion of the above act has not been repealed by a provision in the revised charter of 1872. (*Pamph. L., p.* 686, § 71.) This provision is to the effect that the grade of any street, when established as provided in this act, shall not be changed, except upon the application of the owners of at least three-fourths of the land to be affected thereby. This provision first appeared in the charter of 1869, and reappeared in the charter of 1872 as a part of the revised charter.

The act of 1870 was not enacted as a supplement to the charter. It appears that in 1870 the control of streets in Bayonne was still under the provisions of an act called the Map and Grade Commissioners act, originally passed in 1866. This act placed the management of these matters in a board of commissioners to lay out and map streets. When the charter was passed in 1872 it, by the provisions of section 40, subdivision 1, of the charter, continued the powers vested in the commissioners under the said Map and Grade Commissioners act in the commissioners, until the expiration of the terms of office of the commissioners then in office. Their terms of office did not expire until May, 1873. So, it seems to follow

that as no power had been in the common council to establish
or change grades, nor would be until May, 1873, the provi-
sions of section 71, above set forth, could only apply to grades
thereafter established by the common council under the provi-
sions of the city charter.   By the terms of section 40, sub-
division 1, of the charter, when the terms of office of the map
and grade commissioners should expire, the mayor and com-
mon council were to be vested with their powers, and the
Map and Grade Commissioners act should otherwise continue
in force, except as modified by the charter.   I think, there-
fore, that the provisions in the act of 1870 passed over as a
part of the system of street management into the hands of the
common council in 1873, and that a majority of the owners
of lineal frontage was sufficient for a change of grade where
the street had not been worked to a previously established
grade.

It is, however, insisted that there was not a majority of
the frontage owners upon the application for this improve-
ment.

· The part of Avenue A affected by this ordinance runs from
a point one hundred and thirty feet southerly from the center
line of West Fifty-second street, across intersecting streets, in-
cluding Sixty-second street, to the Morris canal bridge.   The
total frontage on both sides of Avenue A, between these termi-
nal points, is four thousand six hundred and fourteen feet.
The frontage along the changed grade on the intersecting
streets is fifteen thousand eight hundred and ninety-seven
feet.   Whether the application for this change of grade con-
tains the names of the owners of a majority of the lineal
feet, depends upon whether the property owned by Elizabeth
Wilkinson can be counted for the ordinance.   It appears
that the petition presented to the common council contained
the names of persons who had signed a petition previously for
a similar purpose.   An ordinance had been passed upon the
former petition.   This ordinance had been set aside by this
court on *certiorari*, upon the application of the city of Bay-
onne.   This petition was thereafter taken from the files of the

clerk's office, and a sheet containing a number of names was attached to the petition in this case. One of these names was that of Elizabeth Wilkinson, and was signed with her name, " per J. W. Heck, attorney." After the petition with these names was presented a second time, Mr. Corbin, counsel for the railroad company in whose interest the grade was changed, says that he saw Mr. Heck, who told him that the name of Mrs. Wilkinson could be used again unless he notified him to the contrary. Heck did so notify the common council on December 2d, 1890. But on December 16th following he, by a letter, assented that Mrs. Wilkinson's name should stand. In taking the testimony to be used upon this argument Mr. Heck was produced as a witness. He said that he had never seen Mrs. Wilkinson herself in reference to this matter. He claimed, however, to be acting under a written power of attorney. A paper was produced, but it was not proved to be a power signed by Mrs. Wilkinson, and it appeared that the paper was handed to Mr. Heck by a third person, a Mr. Browning, a brother-in-law of Mrs. Wilkinson.

Now, I am of the opinion that a person who, on *certiorari*, attacks a proceeding like the present upon the ground that a signature upon a petition was not authorized, or is not the signature which it purports to be, must, as a rule, show that fact. The circumstance that the body to whom it was presented has acted upon it as genuine, is *prima facie* evidence that it is what it purports to be. But in the course of the proof in respect to the transaction, the burden of proof may shift. Now, in this case it was proved by the prosecutor that the names on one leaf of the petition had been signed and used for the previous ordinance which had been passed. That ordinance had, it is true, been set aside, but the proceeding was an entirety. The proceeding could not be partly vacated and resumed at any particular stage and from that point carried on *de novo*. As a foundation for the new ordinance a new petition was essential. Unless those property owners who had signed the old petition again signed the new or acknowledged the existence of their names upon the new petition, their sig-

natures were useless as a foundation for the new proceeding. When, therefore, it appeared that the names when signed were not signed for the ordinance in question, but for a previous ordinance, it was essential that it should appear that the use of the signatures for the new ordinance was with the assent of the signers. It appeared that the names of Mrs. Godfrey and Mrs. Gross were both upon the petition without their assent, and as to Mrs. Wilkinson, while Heck assumed to permit the use of her name, he, as already appears, was not shown to have any authority whatever to give such an assent. Now, if these names are not counted among those signing the petition, there is less than one-half of the owners of lineal feet fronting on Avenue A applying for the improvement.

Again, the common council has provided in this ordinance for the grading of a portion of all the streets which cross the altered grade of Avenue A.

The scheme contemplated by the act giving authority to change the grade, is to treat each street as a separate subject for its operation. Two or more streets cannot be combined in one proceeding so that an application by all the owners upon one street will confer power to alter the grade of another shorter street against the will of all its abutting owners. Nor is this the professed object of the present ordinance. Avenue A is the object upon which the ordinance is primarily to be operative. But the alteration of the grade of any one street incidentally results in some necessary readjustment of the grades of intersecting streets. At the points of intersection the grades must be so changed as to permit vehicles and pedestrians to pass from the cross streets to the main street as altered. The alteration, however, in such intersecting streets must be such only as becomes necessary by reason of the change in the principal street. The necessity of such readjustment of grades cannot be perverted into an excuse for making an entire change of grade in such cross streets unless it is rendered necessary by the alterations made in the principal street, nor into an excuse for making any change beyond what is necessary for the purposes indicated. The extent of

such incidental change is, of course, largely in the discretion. of the municipal authorities having charge of the improvement. When, however, that discretion is obviously abused, the courts are bound to rectify the abuse. Now, I think it clear that the incidental changes in the cross streets which the present ordinance fixes are entirely beyond the requirements of the changed grade of Avenue A at their place of intersection. As instances of the manner in which the alteration of the grades of the cross streets have been protracted take Fifty-sixth and Fifty-seventh streets. The change of grade of Avenue A at the intersection of it and Fifty-sixth street is a trifle less than three feet. The altered grade of Fifty-sixth street strikes the old grade of that street at a point about one hundred and fifteen feet west of Avenue A. The alteration does not stop at that point, but runs along the same angle about five hundred feet to Newark bay, where the proposed grade is eleven feet above the old grade. East of Avenue A the new and old grades coincide for a distance of about three hundred and sixty feet.

So in respect to Fifty-seventh street. The new grade crosses the old grade of that street at a point about one hundred and fifty feet west of Avenue A, and continues at the same angle about four hundred feet to Newark bay, where the proposed grade is nine feet above the old grade. So an analysis of the extent of the proposed grades upon the other cross streets shows that the alterations are carried far beyond that incidental change necessary for the adjustment of the surfaces of the connecting streets for the purposes of travel or any other conceivable purpose. The grade at Fifty-second street is changed less than two inches, and no change was necessary in Fifty-second street itself. At Fifty-third street the change is about four inches, and fifty feet change on each side is ample. At Fifty-fourth street the change is less than a foot, and one hundred and fifty feet on each side is sufficient. At Fifty-fifth street the change is about fifteen inches, and two hundred feet on either side is enough. At Fifty-sixth street the change is thirty inches, and two hundred and

twenty-five feet on either side is sufficient. At Fifty-seventh street the change is about four feet, and four hundred and twenty-five feet on either side is sufficient. At Fifty-eighth street the change is nine and one-third feet, and four hundred and fifty feet on each side is allowed. At Fifty-ninth street the change is over fourteen feet, and six hundred feet on each side is allowed. At Sixtieth street the change is thirteen feet, and six hundred feet on each side is allowed. At Sixty-first street the change is six and one-half feet, and four hundred feet on each side is allowed. At Sixty-second street the change is about one foot, and one hundred and fifty feet on each side is allowed.

The lineal frontage along the side streets within the reasonable distance allowed for change of grade is five thousand nine hundred and seventy-five feet. It is a larger frontage still than that upon the main street, which has only four thousand six hundred and twenty-six feet. The amount of frontage upon all the streets is, therefore, ten thousand six hundred and one feet. To make up a majority of the owners of lineal feet it will be found that Mrs. Wilkinson, who owns six hundred and twenty-five feet upon Sixty-first and Sixty-second streets within the distances now allowed, is a necessary applicant. As already pointed out, we cannot regard her as a petitioner for this work.

It is therefore perceived that the ordinance fails to be supported by an application in writing by a majority of the owners of lineal feet along Avenue A, or a majority of the owners of lineal feet within the legitimate range of the proposed change upon all the streets.

But there is a question arising out of the excessive extent of the alterations upon the intersecting streets apart from the question of the proportion of lineal feet of frontage represented by the property of the applicants. This question is whether, if the petition had upon it the required representation of property owners, the ordinance could be supported.

As already observed, the plan provided for the changing of grades by the act of 1870 has regard to single streets. The

language is, "that before a street has been worked to grade the grade of said street may be altered," &c.   The application in this case is for an alteration of a particular street, Avenue A, and of the intersecting streets to conform to the grade of Avenue A.   Now, this ordinance provides not merely for the alteration of the two thousand three hundred and seven feet along Avenue A, and the two thousand eight hundred and eighty-seven feet along the intersecting streets which would be the extent of the legitimate incidental alterations on these streets, but provides for an alteration of over five thousand additional feet along these cross streets.   Nearly one-half of the proposed alteration, which amounts to ten thousand two hundred and fifty-six feet, is beyond the power of the common council to affect under this petition and upon this proceeding. Now, it may be suggested that the ordinance is good so far as it affects Avenue A and those parts of the side streets within the reasonable distances required for their adjustment to the changed grade of Avenue A.   But to this view this objection seems to be unavoidable.   If we strike from the ordinance the excess in the lines of change on the side streets, it leaves the plan incomplete.   The lines of the grade upon the side streets will end, in many instances, abruptly, and at a distance above or below the old line and the natural surface of the ground.   A grading in conformity with a part of the ordinance upon the side streets would be impossible, and a departure from the lines laid down in the ordinance would be entirely invalid.   The ordinance must fix the grade.   *Stretch* v. *Hoboken*, 18 *Vroom* 268.   If the lines were altered, then there would be no ordinance establishing the altered lines.   I am, therefore, constrained to the opinion that, so far as this ordinance rests upon the charter of Bayonne or the act of 1870, it is without legal support.

It is further claimed, however, that authority can be found for the enactment of this ordinance in other legislation.   It appears clearly that the purpose of the change of grade was to fix a more convenient grade for a passage above the street by the Jersey City, Newark and Western Railway Company.

This appears from a communication to the common council by the railroad company on November 15th, 1890; by the report of the committee of common council of the same date; by the presentation of a contract made by the railroad company on January 13th, 1891, to grade a street and construct a sewer, which agreement recites that the ordinance was introduced at the instance of the railroad company, and by the passage of another ordinance on the same day authorizing the railroad company to build the sewer and grade the street. The contract mentioned was approved by the city attorney and received by common council and filed.

Now, by the provisions of an act passed in 1874 (*Rev., p.* :944), any city is authorized to enter into contract with any railroad company whose road enters the city, to secure greater safety to persons and property, whereby the company may relocate, change or elevate its railroad, as in the judgment of the municipal authorities may be best adapted to secure the safety of lives and property and promote the interests of the city, and for that purpose shall have power to vacate, alter the lines and change the grades of any street therein.

It has been questioned whether the terms of this act apply to any railroad not existing at the time of the passage of the act. I think that the act applies to any railroad running into a city at the time when the municipal action is taken. The phrase, " any railroad whose road enters a city," was not intended to limit the operation of the act to such roads as were so conditioned in 1874, but was intended to apply to all such as were in that situation when the contract should be entered into and the street grade altered.

But assuming that the power existed to enter into this contract and to make an alteration in the grade of Avenue A under the terms of this act, this difficulty would present itself. It is plain that, in passing this ordinance, the common council did not suppose that it was acting under the provisions of the act of 1874; it took its action under the provisions of the act of 1870. If, however, the change as adopted by the common council had been similar to what it would have

:adopted, and what it would have had a right to adopt, if .acting under the statute of 1874, I think the change could be regarded as entirely legal. But it is apparent that such is not the case. I think it is clear that the present plan would not .have been adopted, and, if what has been said previously regarding the extent of the changes on the side streets is correct, such changes could not have been adopted under the act ·of 1874. The desire to obtain the signatures of the requisite proportion of property owners to approve the change of grade, seems to me to have led to an extension of the change, even ·on Avenue A, much beyond a reasonable distance from the ·place of the railroad crossing. The same desire, I think, :induced the same undue extension of the change of grades of ·the cross streets. If this be so, then the present plan differs ·from that which would have been adopted had the power to :alter grades been supposed to exist regardless of the sentiment ·of the abutting owners.

But, again, the incidental authority to change the grade of :intersecting streets is no greater under the act of 1874 than it :is under the provisions of the act of 1870. If, therefore, the ·change on the side streets is far beyond the reasonable inci-·dental alterations required to adjust the respective grades of ·the intersecting streets, then the plan cannot stand as an entire ·scheme, whether the work was done under the one or the ·other of these respective grants of power. As already remarked, if a portion of the streets is eliminated from the ·operation of the ordinance, the result is to leave an incom- plete, broken and ' impracticable system of grades for the ·remaining portion of the streets covered by the ordinance. ˙I ·conclude, therefore, that the ordinance cannot be supported under the provisions of the act of 1874.

In respect to the force claimed for section 109 of the General Railroad act (Rev., p. 931), I do not perceive that its provisions touch the question under discussion at any point.

The next question is this, Are the prosecutors so related to this matter that they can attack the ordinance in question? The interest which the prosecutors, the board of chosen free-

holders of Hudson county, claim in this street arises out of the provisions of "An act to authorize a board of chosen freeholders of any of the several counties of this state to lay out, open, construct, improve and maintain a public road therein." *Pamph. L.* 1888, *p.* 397.

The act provides for a popular election to determine whether a public road shall be laid out. In case of a favorable result the board of chosen freeholders shall make a map and survey, and file them in the office of the clerk of the board for public inspection. Any street in any city may be improved in such survey. Public notice is then to be given of a time and place when the board will consider whether the road shall be opened. Said meeting shall be open to hear objections in writing to the opening of or the location of the road. After hearing such objections, the board may change the location or adopt the course originally laid down, or abandon the road as laid down on the map. After the board has, by resolution, declared that said road shall be opened, it may condemn and enter upon land necessary for such road. The board shall construct such road by grading the same in such way and manner according to such grade as the board shall fix and determine, * * * *provided,* that such road may be constructed upon the grades established by any municipal authority, if any have been established, as near as conveniently may be or can be done, so as to insure an easy and as near as can be even grade throughout the entire road. In case any grade is changed, compensation shall be paid to any injured person. The board has the exclusive control of such road.

The people of Hudson county, by a popular vote, favored the building of a road in that county. The survey and map was filed on April 16th, 1891. Notice was given and a hearing had on May 18th, 1891. On July 16th following the map was adopted, with some changes ordered. On July 21st the map as changed was adopted as the course and location of the road. The road was one hundred feet in width and included within it that portion of Avenue A where the grade is changed by the ordinance in question.

The situation, therefore, after July 21st was this: The location of the road had become a finality; the road was to be opened and worked by the board and to be within its exclusive control. In executing the work of building the road, regard was to be had to the grades of any streets included within it which had been established by any municipality. Therefore, in fixing the grade of the new road, the grade of any road or street lying within the line of its survey was a matter of direct concern to the board. The grade of any street was such particularly because the new road was to be adjusted to it as far as practicable. The grade of Avenue A became a subject of direct interest to the board the moment the road was finally located. It was a matter which involved the question of expense to the county of Hudson. In the first place, the grade of the road outside the city of Bayonne, and, therefore, the expense of its construction, might be dependent upon the grade of Avenue A. In the second place, the grade fixed by this ordinance was at points on Avenue A much lower than the natural surface of the ground, and as Avenue A was only seventy feet in width and the county road is one hundred feet in width, it would be requisite that the ground included within this extra thirty feet should be excavated down to the street grade. So the board has a peculiar interest in the location of the grade in reference to which its road must be constructed. The board has the right to inquire what is the legal grade of this street. Whether it is on one line or another line is, as already remarked, a matter which involves a question of expense to the county. When this ordinance is invoked as a settlement of the grade line, the board of chosen freeholders, if any one by reason of peculiar interest can have such a right, has a standing in court to test its validity. The board stands in much the same posture as a turnpike company whose road penetrates a city. No one would doubt the right of such a company to challenge the legality of any municipal act which menaced its interests. This was admitted in the case of *State v. Snedeker*, 1 *Vroom* 80.

I have no doubt of the right of the board to sue out this writ.

Nor do I perceive that laches can be imputed to the board on the ground of delay in taking out its writ. Its right to do so became complete on July 21st last, and the writ was allowed October 21st; and in the meantime the ordinance was in this court at the suit of another prosecutor.

But it is further insisted that the writ should be dismissed because of an agreement entered into between certain representatives of the city of Bayonne, of the Hudson county park commission and of the board of chosen freeholders on September 30th, 1890. It appears that on that day there was a meeting, at which the mayor of Bayonne, Mr. Harrison, engineer of the county road; Mr. McGrath, counsel of the board of chosen freeholders; Mr. Corbin, counsel of the Jersey City, Newark and Western Railroad Company, and Mr. Barn, representing the interests of the same company, were present. The meeting was called to talk over the matter of this grade and the way it had affected the several interests represented, and how these interests could be best protected. At this meeting there was much conversation, each person presenting his views, and a statement was dictated to a stenographer, which statement, it is claimed, was afterwards written out and purported to be the result of the consultation. This paper was never signed by any one representing the board of chosen freeholders. Mr. McGrath says that he objected to the stenographer taking the dictation at all, and that he left the meeting before the close of the consultation. Mayor Newman also says that Mr. McGrath objected to the stenographer's notes and refused to sign the paper in that shape. Mr. Harrison's recollection is that the outcome of the consultation was, that a contract was to be made by the railroad company and tendered to the county for its acceptance. No such contract was ever offered for acceptance. Neither Harrison nor McGrath had any power to bind the county by any agreement, nor did they assume to do so. Harrison seems to have heard what was proposed in silence, regarding it as a mere proposition with

which the board of chosen freeholders was to deal, and Mr. McGrath received it without approval in any way. I do not perceive how the proceedings of this meeting concludes the board of chosen freeholders from the prosecution of this writ.

Our conclusion is that the ordinance must be set aside.

GARRISON, J. (dissenting). The board of chosen freeholders had an interest in ascertaining the *location* of the grade of Avenue A, in the city of Bayonne, but has, in my opinion, no standing to attack the *legality* of the ordinance establishing the grade. The interest of the board in the grade of Avenue A arises from the fact that it has included that highway within the lines of its new county road. The duty of the board with respect to highways thus included arises from the statute authorizing the laying out of the county road, which is aptly summarized by Chancellor McGill thus : " In process of construction it (the board) may fix and determine a grade for the road, but in doing so heed shall be had to the established grades of the highways that may be within the county road so that those grades shall be followed (in the words of the statute) 'as near as conveniently may be, or can be, done, so as to insure an easy, and as near as can be, even grade throughout the road.' It is expressly provided that if the grade of an existing highway is changed compensation shall be made to those who may be injured thereby."

The city of Bayonne had authority by its charter to establish by ordinance the grade of its highways. The case shows that the present grade of Avenue A was established by ordinance on the 13th day of January, 1891. The case also shows that the grade established by this ordinance was submitted to the engineer in charge of the county road and to the counsel of the board of chosen freeholders before its submission upon final passage ; and that the ordinance in question was passed more than six months before the board of chosen freeholders relocated their road so as to include Avenue A within its lines. The case further shows that the board of chosen freeholders has never, up to the present time, decided that the grade so

established does not, " as conveniently as may be, insure an
easy and, as near as may be, even grade throughout its road,"
unless ·the action of the board in relocating its road so as to·
include this avenue after the passage of this ordinance be·
deemed an adoption of the grade established by the ordinance.
Inasmuch, however, as this view would bring the prosecutor's
case to an abrupt termination, I shall assume, in aid of further
argument, what is indeed undisputed, that the board of chosen·
freeholders has not, up to the present time, decided that the·
grade of Avenue A is such that the board may not, consistently
with the language of the statute, construct its public road upon
it.   The failure of the board of chosen freeholders to settle for·
itself this question embarrasses at every step its present appli-
cation, and is, in fact, the only thing that gives any color to·
its standing in court.   For this decision, when made, will dis-
pose of the whole matter.   Assuming the decision of the board
to be either in the affirmative or in the negative, there will be·
left nothing that entitles the prosecutor of this writ to obtain
from this court the adjudication it now seeks as to the validity
of the proceedings taken for the establishment of the avenue·
grade.   For if that grade is one upon which, consistently with
the mandate of the statute, the public road may be constructed,
the board is forbidden to change it; and if, on the other hand,
it is not such a grade, the board is forbidden to adopt it, being·
expressly enjoined in such case to obtain by compensation to
those injured a grade which shall insure to the road the feat-
ures described by the act.   It must be evident to every one·
who dwells upon the situation thus presented that what is
sought by this *certiorari* is the opinion of this court in aid of
the decision which, by the terms of the statute, the prosecutor
is called upon to make.   Even when so considered it is only·
in one of two contingencies that the adjudication, if obtained,.
would be of any (and then of doubtful) value to the prose-
cutor.   For if the public road is constructed upon the grade·
of the avenue selected, the question of the validity of that
grade would, so far as this prosecutor could raise it, be laid at
·rest.   If, on the other hand, the road is constructed. upon a·

grade other than that of Avenue A, and the board is called upon to make compensation for changing an existing grade, the grade will be before the court with proper parties upon the question of its legality; whereas, in the manner now sought to raise it its colorable establishment alone is at issue. Whether even this contingency shall ever arise depends upon the decision as to grade, which the board of freeholders itself must sooner or later make.

It is safe to say that no precedent can be found for the proposition that a person charged with the duty of deciding a question of fact can reserve his decision until he has obtained from this court, upon *certiorari*, an adjudication in advance upon one of the questions of law which may possibly arise in the event of one of two decisions he may reach. *Certiorari* is a remedial writ, and the prosecutor to whom the state lends its aid must, if a private person, be one who has a personal or property interest specially injured; or, if a public person, one who can show that the interest committed to its hands is immediately affected. *Jersey City* v. *Traphagen,* 24 *Vroom* 434.

My conclusion is, that the prosecutor has suffered no injury, and hence can have no remedy; that it is threatened with no danger, and hence can ask for no protection; that what it really seeks is, that before making a decision into which the question ought not to enter it may learn in advance whether it will have to make compensation if it constructs its road upon some more suitable grade than that of Avenue A. Upon this point I think the prosecutor should not, at the present time, be advised.

The question of laches is necessarily involved in the foregoing considerations. The silence of the board upon the question of grade has worked substantial injury to the defendants and cannot be screened behind the pending *certiorari* of the landowner. The laches of the board was in respect to a duty with which the landowner and his *certiorari* could not possibly have anything to do.